```
 1                  UNITED STATES DISTRICT COURT

 2              FOR THE MIDDLE DISTRICT OF ALABAMA

 3                       NORTHERN DIVISION

 4

 5   UNITED STATES OF AMERICA

 6        vs.                    CASE NO.: 2:24cr212-RAH-6

 7   DESTINIE JAMES,

 8           Defendant.

 9

10               *  *  *  *  *  *  *  *  *  *

11                        SENTENCING

12               *  *  *  *  *  *  *  *  *  *

13          BEFORE THE HONORABLE R. AUSTIN HUFFAKER, JR., UNITED

14   STATES DISTRICT JUDGE, at Montgomery, Alabama, on Wednesday,

15   January 15, 2025, commencing at 2:38 p.m.

16

17                            APPEARANCES:

18   FOR THE GOVERNMENT:      Mr. Patrick Lamb
                              Assistant United States Attorney
19                            OFFICE OF THE UNITED STATES ATTORNEY
                              131 Clayton Street
20                            Montgomery, Alabama  36104

21   FOR THE DEFENDANT:       Mr. Benjamin Edward Schoettker
                              BARFOOT & SCHOETTKER, LLC
22                            6771 Taylor Circle
                              Montgomery, Alabama  36117
23

24              Proceedings reported stenographically;
                   transcript produced by computer.
25
```

1    (The following proceedings were heard before the Honorable

2  R. Austin Huffaker, Jr., United States District Judge, at

3  Montgomery, Alabama, on Wednesday, January 15, 2025, commencing

4  at 2:38 p.m.:)

5                    (Call to order of the court)

6         THE COURT:  You-all can be seated.

7              Good afternoon.  We're here in the sentencing in

8  the matter of the United States of America versus Destinie

9  James.

10             Let's take appearances, please.

11         PATRICK LAMB:  Patrick Lamb for the United States,

12  Your Honor.

13         MR. SCHOETTKER:  Good afternoon, Your Honor.  Ben

14  Schoettker for Destinie James.

15         PROBATION OFFICER PATTERSON:  Brandon Patterson for

16  Probation.

17         THE COURT:  The magistrate judge previously conducted

18  a change of plea hearing on October 17, 2024, during which the

19  defendant entered a plea of guilty as to Count 1 of the

20  indictment.  Thereafter, the magistrate judge recommended that

21  I accept the defendant's plea of guilty, which I previously

22  did.  I again adopt the recommendation of the magistrate judge.

23  I also accept the defendant's plea of guilty, and, I,

24  therefore, once again adjudicate the defendant guilty as to

25  Count 1 of the indictment.

1          We do have a plea.

2              Is it a superseding or an amended indictment?

3      MR. LABM:  Amended.

4      THE COURT:  Amended indictment.  Okay.  So I just

5  correct that to reflect that it's an amended indictment.

6              We do have a plea agreement; is that correct,

7  Mr. Lamb?

8          MR. LAMB:  We do, Your Honor.

9      THE COURT:  I've read it.  The Government is

10  recommending a within guidelines sentence; is that correct?

11          MR. LAMB:  That's correct, Your Honor.

12      THE COURT:  I'll accept the plea agreement.

13              And did the Government move for the third level

14  on her?

15      MR. LABM:  Judge, we did not.  We believe it's

16  appropriate.  We would ask that the third level be given.

17      THE COURT:  I will grant that.

18              I've got a variance request from Mr. Schoettker.

19  We'll take that up in a second.

20              Mr. Schoettker, have you and your client had at

21  least 35 days to review the presentence report?

22          MR. SCHOETTKER:  Yes, Your Honor.

23      THE COURT:  There was one objection.  Is that still

24  pending?

25          MR. SCHOETTKER:  No, Your Honor.  We have -- in my

1    sentencing memo, Your Honor, I removed objection.

2        THE COURT:  So there are no objections from the

3    defendant?

4        MR. SCHOETTKER:  No objections.

5        THE COURT:  None from the Government?

6        MR. LABM:  There is none, Your Honor.

7        THE COURT:  In compliance with *U.S. v. Booker*, the

8    Court, while not bound to apply the guidelines, has consulted

9    them and has taken them into account on the issue of the

10   appropriate range of sentence to be imposed in the case.  There

11   being no objections, the Court adopts the factual statements

12   contained in the presentence report with specific findings that

13   the total offense level is 22, the criminal history category is

14   I, the guideline range is from 41 to 51 months, the supervised

15   release period is two to five years, and the fine range is from

16   $15,000 to one million dollars.

17       Mr. Lamb, are you satisfied with my findings?

18       MR. LABM:  Judge, I am satisfied.

19       If I could, I did make one error when you asked

20   about objections to the PSR report.  Paragraph 14 -- and

21   Mr. Schoettker and I have discussed this -- says that there

22   were five cashier checks totaling $81,000 to James.  That's

23   actually $89,000 issued to James.  And that will become

24   pertinent as we ask for a forfeiture judgment and restitution.

25       THE COURT:  Is that correct, Mr. Schoettker?

1          MR. SCHOETTKER:  That is correct.

2          THE COURT:  So we will amend the presentence report to

3   reflect that one change.

4          MR. LAMB:  And I apologize I missed that earlier,

5   Judge.

6          THE COURT:  Mr. Schoettker, you do have a variance

7   request.

8                Let me ask you this.  What's the Government's

9   position on restitution?

10         MR. LAMB:  Judge, we believe the restitution we can

11  prove personally attributable to this defendant is limited to

12  the $89,000, which we allege as both -- which we allege as the

13  forfeiture judgment amount, that should also be a restitution

14  amount.  That would be joint and several with Ethan Brown, but

15  it would be payable to Wells Fargo.

16         THE COURT:  And, Mr. Schoettker, anything you want to

17  say on the restitution?

18         MR. SCHOETTKER:  No objections to the 89,000 in

19  restitution.

20         THE COURT:  And then I am sentencing Mr. Brown

21  tomorrow, I think?

22         MR. LAMB:  Yes, Your Honor.

23         THE COURT:  Mr. Schoettker, I'll hear from you on your

24  variance request.

25         MR. SCHOETTKER:  Yes, Your Honor.  Thank you.

1          I think Your Honor probably got a pretty good
2   understanding about what happened in the case.  But
3   essentially, Judge, there were organizers, people that sort of
4   put this whole scheme together; then there were mail couriers,
5   people that worked for the United States Postal Service, who
6   were stealing checks out of the mail; there were some bank
7   employees that were involved in cashing the checks and working
8   the checks through the bank system; and then there were other
9   peoples that were recruiting people to use their accounts at
10  the bank.
11          I don't think Destinie James falls into any of
12  those.  I think -- or I know that the Government has said in
13  their presentencing report that she -- they think she's the
14  least culpable in -- of the people charged in this conspiracy.
15  Obviously, we think the same as well.  I don't think Destinie
16  would have ever been involved in this at all without the fact
17  that Hunter Hudson was her boyfriend at the time when all this
18  was occurring.
19          She has a son with Mr. Hunter Hudson now.  Her
20  son is 11 months old.  Obviously, that played a role into her
21  involvement is her relationship with him.  It doesn't make it
22  right.  She should have had the ability to walk away from that
23  relationship, from that situation, when she began to realize
24  exactly what it is that he was doing, and she did understand
25  what he was doing at some point.  And, unfortunately, when he

1 | decided --
2 |           You know, he had been doing this for a while
3 | before he ever tried to give Ms. James any money.  But at some
4 | point, there was a decision for Ms. James to get checks.  And
5 | she did get five checks -- cashier checks from a Wells Fargo
6 | account that were put into her bank account, and they, as the
7 | Government has said, totaled $89,000.  Obviously, she had no
8 | right to that money, she should not have taken that money, but
9 | I think the relationship played a huge part in this.
10 |          THE COURT:  Well, let me stop you since we're talking
11 | about it.  What happened to the money?
12 |          MR. SCHOETTKER:  I don't believe it exists anywhere
13 | anymore.  I believe it was spent.  I could not tell you exactly
14 | what Ms. James did with the money.  It's not something that
15 | I've actually had a conversation with her about.
16 |          THE COURT:  And the reason I ask that, Mr. Schoettker,
17 | is that I noted -- this is the second time this has come up in
18 | these proceedings -- that she had not provided her financial
19 | information back to the pro- -- this is paragraph 57.  She
20 | apparently did not complete the financial statements and
21 | provide her net worth and monthly cash flow statements or
22 | backup information to the probation officer.
23 |          MR. SCHOETTKER:  Well, Judge, I -- I know she's
24 | reported, in the paragraph just below, some of her monthly
25 | income and her monthly expenses.  I was not aware that that had

1  not been provided.  I guess at this point, it still hasn't been

2  provided.  I don't know.

3          THE COURT:  You can proceed on.

4          MR. SCHOETTKER:  Judge, the second thing I wanted to

5  bring to -- to the Court's attention is her -- is her age.

6  She's in her early 20s now.  She's either 22 or 23 years old as

7  she stands here, Judge.  So back when these events were

8  happening, back in '22 and '24, Judge -- or specifically, she

9  got the checks -- when she got the checks, we're going to be

10 from December of '22 to February of '23, she would have been

11 either 19 or 20 years of age, Judge.  That doesn't excuse it

12 obviously, but, again, I think that people obviously at younger

13 ages make decisions that they would never make as they get

14 older.

15          I certainly think that Destinie James will never

16 make this type of mistake again.  But I do think that Destinie

17 James, at 30 years of age, presented with this situation, even

18 without this happening, would have had a better chance of

19 saying, you know what, this is not something that I need to be

20 involved in.  So I do think her age played a role into how and

21 why she was involved in this, especially when you take that age

22 and you put that age now into a relationship with -- with a

23 boy, essentially.  And so I think all of that played a part

24 into her role and why she was involved in -- in this at all.

25          She basically, Judge, was, you know, on the

1   outskirts of this whole thing and really benefited when

2   Mr. Hudson gave her the money.  So, Judge, we -- we clearly

3   think certainly that whatever the sentence that this Court

4   hands out to all these other conspirators, that Ms. James

5   should be at the bottom of that situation given her role and

6   given her age and considering the fact that she was in a

7   relationship at the time with the person that sort of brought

8   her into the crime.

9           Judge, she's a super smart girl.  She's

10  University of Tuskegee.  She's got a dual major in computer

11  engineering and electrical engineering.  She has a GPA well

12  over 3.0.  Judge, she's always trying to figure out a way to

13  better herself.  She's got -- she's set to graduate from there,

14  Judge, May the 10th.  She's in her last semester, currently

15  enrolled and in school there.  She's been accepted to a couple

16  other universities if she doesn't go to prison, Judge.  She's

17  been accepted to some graduate schools.  She has some job

18  opportunities that have already been offered to her once she

19  graduates from the University of Tuskegee.  She's got a lot to

20  look forward to in the future.

21          She has a family that's supporting her.  They are

22  here today.  She has grandmothers here today, aunts, mother,

23  some -- a couple of best friends here.  She's got a good

24  support system around her, Judge.

25          She's got a lot of restitution.  And also, Judge,

1    she's going to be -- she's 22 years old, and she's got $89,000
2    worth of restitution around her.  Obviously, sentencing is for
3    punishment.  There are ways to punish people besides
4    incarceration.  She will be punished by having a felony on her
5    record.  She will be punished by age 89 -- I mean, age 22
6    having $89,000 that she's going to have to pay back.  That was
7    all brought on by herself for sure, but I don't honestly see
8    the benefit of society as a whole really by sending her --
9    she's going to be a productive member of society.

10           She needs to pay back $89,000 to Wells Fargo.
11   And I think given the chance -- and by the way, she's never had
12   a -- she has no criminal record to speak of.  This is the first
13   time she's had any involvement with law enforcement.  But I
14   think given the chance, she will continue her education, she
15   will get -- she will find a job, have a job, she will work, she
16   will pay back the restitution.  I think all of this serves her
17   and the community better than putting her and -- locking her up
18   and making her sit in prison for however long the Court
19   decides.  I don't think that's good for her.  I don't think
20   that's good in this particular circumstance for our community,
21   to be honest with you.  I think she needs to be out there
22   working, finishing her education, and paying back Wells Fargo.

23           And obviously, it would have a huge impact on her
24   child.  Obviously, Mr. Hudson is going to prison.  The child's
25   father is going to prison for a good while.  And if this Court

1  decides to send her to prison, he's not going to have any

2  parents out for a while.

3          So, Judge, that's why I ask for probation,

4  because all of that considered, I think she would make a good

5  candidate for probation.  We are asking --

6         THE COURT:  I don't think she would qualify for

7  probation.

8         MR. SCHOETTKER:  Judge, I -- I think -- if I'm not

9  mistaken, I think the Court could put her on probation.  But I

10  also think the Court could put her on home confinement, and

11  she -- I've discussed that with her, and she is -- obviously,

12  she'd rather be on probation, but she is amenable to that and

13  would certainly be able to make that happen.  If the Court

14  decided to put her on supervised monitor with a leg monitor or

15  whatever the Court wanted to do, that is a -- we certainly

16  would do that.  She would be willing to do that.

17         THE COURT:  What is her status with Mr. Hudson?  And I

18  know he's the father of the child, but are they married, still

19  dating, or is there --

20         MR. SCHOETTKER:  They are not married, Judge.  And he

21  was taken into custody at the time and has been incarcerated

22  ever since.  So, you know...

23         THE COURT:  That doesn't prevent people from getting

24  married.  They seem to get married fairly often when --

25         MR. SCHOETTKER:  I don't think there's any plans for

1    marriage to Mr. Hudson.

2            THE COURT:  And what's her employment status today?

3            MR. SCHOETTKER:  She has a part-time job, Judge, with

4    a start-up company called Mobius Ventures.

5            THE COURT:  What does Mobius Venture do?

6            THE DEFENDANT:  It's a venture capital company.  And

7    essentially, they fill other side of funding.

8            THE COURT:  It's an angel funding type company?

9            THE DEFENDANT:  Yes, sir.

10            THE COURT:  Mr. Lamb?

11            MR. LAMB:  Judge, we agree with part of what he said

12    and we disagree with part of it.  The part we agree with, she

13    talked about the influence of another individual, she talked

14    about how her involvement was as a minor participant.  We agree

15    with that.  And because of that, we have already given an

16    adjustment for her role in the offense in paragraph 33, where

17    her total offense level was reduced by two.  We took into

18    account her participation.  And that is not a proper grounds

19    for a variance because it is already being considered.

20            Judge, we further point out the defense attorney

21    very astutely pointed out that, you know, we've got a series of

22    checks in late 2022 through early 2023 where she received

23    $89,000 in cash over the course of two or three months, and

24    that was during the four or five months that Ethan Brown was

25    involved, and that he pointed out that was a very small period

of time in her young life.  Well, we would point out that
that's true.  However, that's not all she's charged with.

Hunter Hudson was picked up in May of 2022, which
is, you know, several months -- a half a year before any of
this -- or before any of those checks were issued.  And for the
four to five months preceding that, he was on a telegram chat
through her -- also on her phone where they were discussing
fraud, and she was willingly discussing back and forth the bank
fraud and mail fraud that he was engaged in.  We don't want to
make it sound like she was the kingpin or she was the planner
or she was telling Hunter Hudson what to do, but that's over a
year that she's been involved in this conduct.

And then as far as going beyond that year, when
she did get picked up, she and Hunter Hudson -- let me take
that back.  When Hunter Hudson got picked up for his Florida
warrants, she was present in the vehicle with him.  There were
checks in the vehicle with the two of them.  At his residence
there were additional checks, and because he was a felon and
couldn't possess a firearm, she concealed his firearm in their
child's diaper bag.

We just point out to Your Honor that this is not
something where she just had a casual brush with this
particular criminal scheme.  We're talking about from late 2021
all the way through the middle of 2024 she is either actively
involved in the scheme as it's ongoing but certainly is

1  willingly putting herself in the middle of what Mr. Hudson has

2  going on.  And as recently as the middle of 2024, she's in the

3  car with him where they find checks, where they find his gun

4  that she has concealed in the diaper bag, and that this is not

5  appropriate for a downward variance.

6         We've already taken into account that she is a

7  minor participant.  We have already recommended a two-level

8  downward departure based on that.  And we would ask Your Honor

9  to accept the calculations of the probation office, to

10  determine that that is the appropriate sentence, and once you

11  do that, we're going to recommend a bottom of the guidelines to

12  give her a break again.  But we think it should be based on a

13  proper calculation of the guidelines, which take into account

14  her conduct and her involvement in this scheme.

15      THE COURT:  And her specific conduct that you're aware

16  of is -- one observation in the presentence report is whenever

17  Mr. Hudson seems to be -- find his way with the police, she's

18  right there by his side.  So she's got more of a role than

19  somebody who just happened to be -- have a bank account and,

20  hey, will you cash these checks or run these checks through

21  your bank account; she's there.

22      MR. LAMB:  And, Judge, we would indicate what she told

23  the police is, I don't know anything about it.

24         And don't get me wrong.  I -- I get that

25  you're -- you're not required to confess to the police when you

1  commit an offense. But when they went back, after she denied
2  any knowledge of it, and they looked on his phone and found
3  communications, there were communications between the two of
4  them that very actively discuss bank fraud.

5           And his only three encounters with law
6  enforcement are:

7           In May of 2022, he was stopped by law enforcement
8  in Lee County. He had checks, including a check that had been
9  altered to have his name on it. Her fingerprints were on one
10 of the checks that were stolen out of the mail that were in
11 that vehicle.

12          When he came into contact with law enforcement
13 again, because he was arrested on a warrant out of Florida, she
14 was with him again, and there were stolen checks in the vehicle
15 at that time. And that's when the firearm was hidden inside
16 of -- inside of the diaper bag.

17          And then the last time Hunter Hudson had contact
18 with law enforcement is when she was picked up on her warrant,
19 and he turned himself in as well as a part of -- of her arrest.
20 So all three times Hunter Hudson came into contact with law
21 enforcement, she was involved in those encounters.

22          THE COURT: And have you been able to trace what
23 happened with the money that was put into her Wells Fargo
24 account, or did it get -- or did Wells Fargo stop those
25 transactions before the checks cleared?

1    MR. LAMB:  Judge, I believe the checks cleared.  There
2    was -- it didn't appear to be something where the money was
3    being laundered to go to somebody else.  It appeared that she
4    was -- my memory is that she was the ultimate destination of
5    those funds.  And -- and I can't tell you beyond any certainty
6    what happened to those funds.  I believe they were just spent.
7    THE COURT:  Because, obviously, the concern on my end
8    is when I read all of these presentence reports, there's a lot
9    of money that's being stolen.  And I think just about
10   everybody -- nobody is in custody.  I think everybody may be
11   out on bond.  And then I've got two defendants now back to back
12   who have not turned in their financial paperwork, which
13   suggests to me that there may be an intent to hide things; that
14   maybe there's some money out there sitting in a bank account,
15   sitting in a back yard, sitting bundled up in a closet
16   somewhere.  I just have a concern there when I see this.
17          Am I imaging my observation there, or could that
18   really be occurring?
19   MR. LAMB:  Judge, one of the big problems we have is
20   that the last time we can put money in her hands is early '23.
21   And we didn't have her indicted for, you know, a year -- over a
22   year after that.  And it's just -- we tried to -- to find funds
23   that we could trace back to this, and we were unable to.
24          And, Judge, you know, it -- don't get me wrong.
25   Part of the problem with that is the -- the -- the scale of the

1    fraud.  Because as you saw in the PSR, you know, Hunter Hudson

2    in particular, you know, you just go from, you know, Sarasota,

3    Florida, to -- to West Georgia to -- you know, it's just layer

4    after layer.  And then we get to the telegram chats where we

5    can't trace those funds at all because we -- we don't have

6    copies of the checks.  What we have are, you know, references

7    to, I've got five checks in these amounts, who wants to buy

8    them, you know, where we don't know who the account holder is,

9    we don't know -- you know, we don't have any information that

10   we're able to -- to track that.

11            And -- and then the other thing is that as far as

12   the money flow of the -- of the working money -- and I -- I

13   discussed this just yesterday with somebody -- is if it's

14   $100,000 check, you know, the thief is going to get paid.

15   Whoever got the check, they're going to get paid for that check

16   to come into this process.  So there's some money that goes to

17   them.  And then the check gets altered and put into the bank,

18   and assuming that if it doesn't go through, then that money

19   that got spent to purchase the check, it's just gone, and

20   somebody is out as part of the operating expenses; but if it

21   does go through, then it starts getting split up.  You got the

22   person that obtained the check that wants his initial outlay

23   and he also wants some more money, and then you got the account

24   holder, and they're going to get paid.  It's just --

25            THE COURT:  Well, it's no different than the drug

1    dealer selling his drugs down the line.

2          MR. LAMB:  Yes, sir.  Yes, sir.  And -- but it -- it

3    ends up, with us, we don't know who got what money, who got how

4    much money, you know, what the -- the flow is.  And in

5    particular, other than that account holder that the check

6    initially goes into, once it comes out as cash, it's very

7    difficult to track the funds and being able to -- to pursue

8    a -- a forfeiture.

9          THE COURT:  Her checks with Wells Fargo, were those

10   government checks?

11         MR. LAMB:  They were cashier's checks from Wells

12   Fargo.

13              There were 61 checks that Ethan Brown or -- I

14   believe it was just Ethan Brown, or perhaps Sabrina Grant who

15   was working under him, they took 61 checks.  They put them into

16   58 accounts.  And out of those, Ms. James received five

17   cashier's checks, Hunter Hudson received about that same

18   amount, and Rueben Brown received one check, but then there

19   were other checks that went to, you know, just a variety of

20   people; and then the account holder, of course, had some money

21   left in their account that they were able to take out.  So, you

22   know, we end up with the money going out, and the only way we

23   were able to track that $89,000 to Ms. James was that she had a

24   cashier's check written to her as opposed to being written to

25   cash.

1      THE COURT:  I think, Mr. Lamb, you filed in this case
2  as well your chart?
3      MR. LAMB:  Yes, Your Honor.  And as far as the
4  hierarchy goes, we would certainly concede that Ms. James did
5  not appear to be directing anybody else.  She did appear to be
6  accepting instruction from Mr. Hudson.
7          As far as the telegram chats that we saw, we had
8  no reason to -- or we did not have the ability to prove that
9  she was directing or recruiting anybody.  Did she?  You know, I
10 -- I -- I'd say maybe.  I'd say -- you know, there's probably a
11 really high chance if she's working with Hunter Hudson that he
12 has her recruiting people, but I can't prove that, and I
13 certainly don't expect for Your Honor to accept that as a
14 proven fact in this case.
15     THE COURT:  Well, let me put it more in perspective.
16 Tomorrow I think I am sentencing Mr. Brown, Ethan Brown.  I
17 think his attorney is sitting in the back here.  Where does
18 Ms. James fit with respect to Mr. Brown?
19     MR. LAMB:  Mr. Brown, as far as the conspiracy
20 hierarchy goes, is at the bottom because he's accepting
21 direction.  That being said, his personal involvement elevates
22 him above Ms. James.  We can't prove, other than her receiving
23 checks, that -- that she is receiving other funds other than
24 just whatever funds Hunter Hudson chooses to -- to convey to
25 the mother of his child.

1          With -- with Mr. Ethan Brown -- and I always use

2   the first name because there's also a Rueben Brown.  With

3   Mr. Ethan Brown, his name came to light initially because Wells

4   Fargo spotted that they had all these suspicious transactions

5   that occurred in a very short window of time during a time

6   period that the branch manager -- there was no branch manager

7   at that branch, so Ethan Brown, for at least a portion of that

8   time, was the ranking bank official, and there was no one for

9   him to go to to get override approval when there were security

10  precautions in the bank system.

11         So as far as the hierarchy goes, Ethan Brown is

12  at the bottom of the pyramid.  As far as culpability goes, we

13  certainly would not characterize him as being at the bottom

14  because he facilitated over 2.3 million dollars' worth of

15  intended loss, and Wells Fargo suffered an actual loss of over

16  $900,000.

17         THE COURT:  Mr. Schoettker?

18         MR. SCHOETTKER:  Yes.  Just briefly, Judge.

19         I would just ask the Court to be careful not to

20  correlate the relationship with the crime.  I know a minute ago

21  I did, but I'm saying as far as the length, the time of it.

22  Because just because she was in his presence every time he got

23  stopped, that doesn't mean she's actively participating in the

24  crime at that point.  I mean, they're boyfriend and girlfriend,

25  and they're in college, so whether she's actively participating

1    in the crime or not, she's going to be around her boyfriend

2    every day.  I mean, I've --

3          THE COURT:  Well, this is a conspiracy.  And the key

4    players in the conspiracy is her boyfriend, a very key player,

5    and she seems to be right there by his side.

6          MR. SCHOETTKER:  Here's my point.  If you look at the

7    checks, it happened -- for three months she received checks.

8    And supposedly he got stopped in '22, and she's there.  He gets

9    stopped in 2024.  If she's actively participating in a

10   conspiracy from '22 to 24, why does she get three -- for three

11   months, five checks?  That's why I'm saying don't -- it would

12   be really easy to say she's actively involved in a conspiracy

13   from '22 to '24 because she's in his presence.  Well, that's

14   her boyfriend.  It doesn't necessarily correlate is what I'm

15   trying to say.

16               As far as the weapons, the weapons clearly belong

17   to Mr. Hunter.

18         THE COURT:  How is that?

19         MR. SCHOETTKER:  Okay.  I don't think the Government

20   would dispute that, that -- that the weapons belong to Hunter.

21   I don't think these weapons belong to Ms. James.  And

22   because --

23         THE COURT:  It's a bad look.  You got a Glock --

24         MR. SCHOETTKER:  It is a bad look.

25         THE COURT:  -- a Glock in the baby's diaper bag.

1    MR. SCHOETTKER:  I agree.  But I can assure you what's

2    likely happened is they were pulled over by the cops,

3    Mr. Hunter has got his weapon, and he's trying to conceal his

4    weapon in a diaper bag.  I'm sure that's what happened.  I'm

5    not saying she didn't know that he carried guns because I'm

6    sure she did, but -- but I'm just saying that's -- I don't

7    think that that was -- that's more his doings than hers.

8         THE COURT:  Walk me through this.

9              And I'll give you a chance, Mr. Lamb, in a

10   second.

11             This is a financial-related crime.  I've never

12   had a defendant who's been charged with such come and ask the

13   Court to take so many trips like your client has:  South

14   Africa, Arizona, Virgin Islands, Puerto Rico, and Illinois.  It

15   just struck me as odd given this kind of case.  Can you walk me

16   through a little bit of what I was seeing on paper and that I

17   shouldn't be concerned that any of this was going to be funded

18   by any of the moneys that's been --

19        MR. SCHOETTKER:  Well, the Illinois --

20        THE COURT:  -- taken?

21        MR. SCHOETTKER:  Yeah.  The Illinois trip was for her

22   aunt who passed away, Judge.

23        THE COURT:  Well, I understand that.  But there's

24   still a cost associated with traveling.

25        MR. SCHOETTKER:  There is.  But, I mean, you know,

1    she -- she is young obviously, but she has family.  So just

2    like I wish I didn't pay for any of my 22-year-old daughter's

3    stuff, for a lot of it.  So I think she has other income,

4    finances to support her besides what she can generate on her

5    own.

6                    I will say this, though.  I am --

7            THE COURT:  Well, you said she has other income to

8    support her?

9            MR. SCHOETTKER:  I'm talking about her family

10   supporting her with their income.

11                   I would say this.  I find that almost a little

12   bit troubling that we would have a problem with that, because

13   if you look at everything she's trying to do, she was trying to

14   go to --

15           THE COURT:  Well, that's why I'm asking you to explain

16   it to me.

17           MR. SCHOETTKER:  Yeah.  The second thing, she's trying

18   to -- all of that -- the other trips were for educational

19   purposes in order to -- she was going out to Arizona State

20   because that's one of the places where they had given her an

21   opportunity to finish -- to get her master's degree.  And she

22   was going to go out there and look at it and talk to them and

23   see.

24                   So I kind of see it the other way.  I normally

25   don't have clients who are trying to better theirselves even

1    knowing that there's a potential that they might go to prison.
2    I mean, from that standpoint, I say kudos to her.  Because
3    she's never stopped trying to figure out a way to make it in
4    this life and get more educated and how to support her child.
5    And those trips, that's what those purposes were.  So I
6    would -- I wouldn't -- I'd ask the Court certainly not take
7    that into account in the sentencing.  I think that's her just
8    trying to better herself.

9         THE COURT:  Mr. Lamb, there was something you wanted
10   to address?

11        MR. LAMB:  Judge, just specifically, defense attorney
12   talked about not holding against her that she's committing the
13   offense just because she's with Mr. Hudson.  We would point out
14   in late '21, early '22, she is exchanging texts that talk about
15   bank fraud.  A few months later, May of '22, Hunter Hudson is
16   found with all of these checks, but her fingerprint is on one
17   of those checks.  And then when Ethan Brown becomes involved in
18   the conspiracy in late '22 into early '23, that's when she gets
19   the five checks.

20             So as far as her personal involvement in fraud,
21   that's the better part of a year and a half.  And that's not
22   even counting the -- the '24 incident, where -- where the gun
23   is concealed in the diaper bag and the car has got all the
24   stolen checks in it.  Assume she doesn't know anything about
25   these stolen checks sitting, you know, right next to her in the

1    car, you know, that's still a year and a half where she is

2    actively involved in what was going on.

3              THE COURT:  All right.  You told me yesterday that

4    there were several hundred people that were also involved in

5    this through the use or making available their bank accounts or

6    checking accounts?

7              MR. LAMB:  Yes, Judge.  There were a variety of

8    individuals who recruit people with account holders at specific

9    banks.  We're not alleging Ms. James did that.

10             THE COURT:  Well, that was the question I was getting

11   ready to ask is just that.

12             MR. LAMB:  If she did, we can't prove it.  You know,

13   who we can prove are -- are Hunter Hudson, Kerry Hawthorne, I

14   believe Rueben Brown.  I don't recall off the top of my head

15   Brandon Gage.  But I believe the majority of the defendants

16   other than Ethan Brown and Destinie James were recruiting

17   account holders.

18                  You know, some of them were -- were getting

19   checks, but the majority of those six were out getting account

20   holders because that was sort of the bread and butter.  Once

21   you had the stolen altered check, you still had to have

22   somewhere to put it to try to get cash out.  We don't -- I

23   don't have any evidence that Ms. James did that.

24             THE COURT:  Okay.  Has Mr. Hudson pled guilty?

25             MR. LAMB:  He hasn't pled, Judge.  His sentencing was

1   continued to April the 1st.

2          THE COURT:  Do I have him?

3          MR. LAMB:  You have all eight.  The only ones you

4   don't have are -- there are two mailmen.  One has already been

5   sentenced, and the other will be sentenced either next week or

6   the week after, I think next week, and they are both before

7   Judge Thompson.  But they were both charged before this

8   conspiracy was charged, and -- and their case was resolved as

9   kind of a preliminary matter regarding this case.

10         THE COURT:  Okay.  All right.  Mr. Schoettker,

11  anything else you want to address?

12         MR. SCHOETTKER:  No, Your Honor.  I think

13  Ms. Hudson -- I mean Ms. James does want to say something.

14         THE COURT:  Okay.  Ms. James.

15         THE DEFENDANT:  I just want to say good afternoon to

16  everyone here.  And I have a couple of things that I listed

17  down that I wanted to -- going to say because I haven't said

18  anything in court thus far besides the basics.

19             So today is obviously sentencing.  And, you know,

20  I did take my plea a couple of months ago, but I just want to

21  openly say that, you know, I do take responsibility for my

22  actions here.  I acknowledge that I screwed up.  That's just

23  it.  But I'm just hoping that you -- I'm just hoping that you

24  give me a second chance to, you know, fix it and make things

25  right.

1          You know, I am set to walk with two degrees in
2    May and supposed to start my master's program in June for a
3    master's in biomedical engineering.  And ever since the case
4    has happened, like my lawyer said, I've just been trying to
5    find other ways to, you know, make my life better and get
6    myself back on track.
7          And so as far as the request for travel, to speak
8    on the portion for South Africa, I am the co-founder and the
9    current leader of the Women Connective Exchange Program.  That
10   is an internship program that I currently run for women in
11   South Africa, and I've been running that program for about
12   almost two and a half years now.  And so over the course of the
13   past two years, we've been trying to get funding.
14         And so the -- the company that actually offered
15   me a job in Arizona -- and that was another place I was also
16   going to go to grad school -- they -- which is Honeywell --
17   they -- actually, we got funding from them to go to South
18   Africa.  And they gave us, I want to say, about $60,000 to take
19   about ten girls from Tuskegee University.  And the girls from
20   South Africa are actually set to come to Tuskegee University
21   this April to meet with us and to, you know, learn about
22   America and learn about Civil Rights, because we'll be bringing
23   them to Montgomery and to Atlanta.  So that's kind of where
24   that trip came -- those two trips kind of came in together.
25         I also just wanted to say that, you know, I guess

1    I did make a mistake here, and I totally apologize for that.

2    I'm acknowledging it.  And I'm just looking to try to make

3    things right.  And I have a job lined up after school.  As you

4    know, having a felony on your record is going to make things a

5    lot harder for me to get a job for what I do.

6             I specialize in cyber security and software

7    engineering.  And since then I've lost my security clearance,

8    which has kind of like disqualified me from a few jobs so far.

9    But I do have two other places that are still open to hiring

10   me.  And that would allow me to pay restitution, you know, and

11   provide for my son and myself and just keep moving forward and

12   never make another mistake like this again.  And I just hope

13   that you consider that today.  And I'm hoping to do whatever I

14   have to do to stay, you know, away from jail time.

15            THE COURT:  Are you in school now?

16            THE DEFENDANT:  Yes, sir.

17            THE COURT:  And you will graduate in May?

18            THE DEFENDANT:  Yes, sir.

19            THE COURT:  And you will have a degree in what again?

20            THE DEFENDANT:  Two bachelor's degrees, one in

21   computer engineering and the other in electrical engineering.

22            THE COURT:  You make this one really hard, Ms. James.

23   You are a super smart girl.  And when I started reading this, I

24   just scratched my head as how can this girl who appeared to be

25   on a track for success in life with all of these internships

1　and the world was going to be your oyster, and then you got

2　caught up in all of this.  And you're already seeing some of

3　the ramifications from it because you are a convicted felon,

4　and it disqualifies you from a lot of the things I could see

5　that you wanted to do.  Whether it's a security clearance at a

6　business, it's going to impact your ability to work in any

7　industry where there's a fiduciary money handling aspect;

8　you're not going to be able to do that because of all of this.

9　And you really created a big hurdle in your life.

10　　　　　　All right.  Mr. Schoettker, anything else?

11　　　　　MR. SCHOETTKER:  No, Your Honor.

12　　　　　THE COURT:  Mr. Lamb?

13　　　　　MR. LAMB:  No, Your Honor.

14　　　　　THE COURT:  Let me see the lawyers in the robing room

15　real quick.

16　　　　　　　(Recess from 3:39 p.m. to 3:45 p.m.)

17　　　　　THE COURT:  Mr. Lamb, anything else on the variance

18　request?

19　　　　　MR. LAMB:  Judge, not on the variance.  But at the

20　appropriate time, we do want to make an oral motion for

21　restitution.

22　　　　　THE COURT:  Okay.  And, Mr. Schoettker, anything else

23　on the variance request?

24　　　　　MR. SCHOETTKER:  No, sir.

25　　　　　THE COURT:  I am granting a request for a variance.

1           Mr. Lamb, anything else from the Government
2  before I pronounce sentence?
3           MR. LAMB:  Judge, the Government makes a motion for
4  $89,000 in restitution to be paid to Wells Fargo Bank, and that
5  is for the reasons stated previously.
6           THE COURT:  Mr. Schoettker, anything else you wish to
7  say before I pronounce sentence?
8           MR. SCHOETTKER:  No, Your Honor.
9           THE COURT:  Ms. James, I know you've already spoken,
10 but is there anything else you wish to say?
11          THE DEFENDANT:  No, sir.
12          THE COURT:  Okay.  I'll be frank with you, and I'll
13 say it again, I've really struggled with this one because most
14 folks that come through here just don't have the background
15 that you did.  You grew up with a good family.  You're clearly
16 smart and bright.  Gosh, the world was your oyster -- and I
17 still think it is -- and then you would do something like this.
18 Gosh, you closed a lot of doors.  You closed a lot of doors.
19 But I can't ignore the fact this was a very sophisticated
20 scheme.  You played a role in it.
21          I think you played a more significant role than
22 what the presentence report would suggest because you were
23 right there for a lot of this.  And I think it's just more than
24 a couple of cashiers checks that were made out to your name.
25 You were right there for a lot of this.  And you've pled guilty

1  to a conspiracy on this.  And I think you've enjoyed the

2  benefits that were reaped from all of the stolen money.  And a

3  lot of people think, well, a financial crime, there is no harm;

4  maybe it's harm to a bank, but we all hate banks or we all hate

5  the government and so there's really no harm there.  But this

6  does cause real harm.  It really does.  You may not be able to

7  see it particular to each check, but these things do cause real

8  harm.

9          And I'll be quite frank with you, and I'll tell

10 you why is, you know, people are scared to put -- send checks,

11 birthday checks to their grandchildren, or put anything in the

12 mail because there's folks like this gang of people that were

13 pulling checks out of the mail.  I mean, there is a complete

14 distrust of the United States Postal Service in this area.

15 That's the kind of repercussions this conduct has.

16          And why a smart girl like you would get yourself

17 tied up into all of this I just -- gosh, because you're not the

18 type -- the normal type of person I see that comes through

19 here.  It really tears me up on that.  But I have to look at

20 the totality of everything that's in front of me on here.  It's

21 not a one-off issue of a crime of passion.  This played out for

22 quite a while.  And you knew it was wrong.  You did.

23          So I've taken all of this into account, and I'm

24 going to craft a sentence accordingly.  The sentence will now

25 be stated, but you'll have a final chance to make legal

1    objections before the sentence is imposed.

2            Having considered and consulted the sentencing

3    guidelines, the presentence report, the submissions of the

4    parties, the totality of the circumstances, the arguments of

5    counsel, and evaluated the reasonableness of the sentence

6    through the lens of 18 U.S.C. Section 3553, it is the order,

7    judgment, and decree of the Court that the defendant is

8    committed to the custody of the Federal Bureau of Prisons to be

9    imprisoned for a term of 22 months.  This is a variance below

10   the guidelines.  The Court finds that the sentence imposed is

11   sufficient, but not greater than necessary, to comply with the

12   statutory purpose of sentencing.

13           Furthermore, I find that the sentence is

14   reasonable when considering all of the sentencing factors found

15   at 18 U.S.C. Section 3553, with particular emphasis on the

16   respect for the law, the seriousness of the offense, to afford

17   adequate deterrence to criminal conduct, and for unwarranted

18   sentencing disparities among defendants, and to provide needed

19   restitution to any victims in the case.

20           Upon release from imprisonment, you shall be

21   placed on supervised release for a term of five years.  Within

22   72 hours of release from custody, you must report to the

23   probation office in the federal district where you're

24   authorized to reside.

25           And what that means, Ms. James, is you're going

1    to be living under my thumb for essentially five years.

2    There's going to be rules that you have to abide by.  There

3    will be a probation officer that you'll have to be accountable

4    to.  And whatever that probation officer requires of you, you

5    need to follow through with.  Okay?  That means responding to

6    phone calls, to texts, to emails; that means showing up for

7    drug tests if necessary; and, most importantly, it means

8    staying out of trouble.  And you need to stay away from people

9    that can get you in trouble.

10           I don't know what your future course is going to

11   be with Mr. Hudson.  I don't know what's going to happen to

12   him.  I don't know what role he's going to have in your life,

13   but he is going to be a convicted felon as well.  And if by

14   chance you two decide you want to create a life together, you

15   just know that those same rules that apply to you apply to him

16   as well, and don't let any kind of trouble he gets into get

17   attached to you.

18           So while on supervised release, you shall comply

19   with the mandatory and standard conditions of supervised

20   release on file with the Court.

21           The Court also orders the following special

22   conditions:

23           You shall provide the probation officer any

24   requested financial information.

25           You shall not obtain new credit without approval

1   of the Court unless in compliance with the payment schedule.

2          You shall submit to a search of your person,

3   residence, office, or vehicle pursuant to the search policy of

4   the court.

5          You shall pay to the U.S. District Court Clerk a

6   special assessment fee of $100, which is due immediately.

7          Also you are ordered to pay the U.S. District

8   Court Clerk a fine in the amount of $25,000, which is due

9   immediately.  Any balance remaining at the start of supervision

10   shall be paid at a rate of not less than $100 per month.

11          As it concerns restitution, restitution is

12   applicable in the case.  The restitution is ordered in the

13   amount of $89,000 payable to Wells Fargo Bank as the victim.

14   Payments are to be made to the U.S. District Court Clerk for

15   distribution to the victim.  Any balance remaining at the start

16   of supervision shall be paid at a rate not less than $100 per

17   month.  Interest on the restitution is waived.

18          As it concerns remand or surrender, I'm going to

19   set a surrender date of June 10 of 2025 because I want you to

20   finish your studies and get your degree, Ms. James.  Okay?  So

21   you shall surrender at the institution designated by the

22   Federal Bureau of Prisons before two p.m. on Tuesday, June 10

23   of 2025.  Until that time, you shall comply with the conditions

24   of release which were previously imposed by the Court.

25          Mr. Lamb, are there any objections to the

1  sentence by the Government or the manner in which I pronounced

2  it?

3          MR. LAMB:  There are not, Your Honor.

4          THE COURT:  Mr. Schoettker, how about you?

5          MR. SCHOETTKER:  No, Your Honor.

6          THE COURT:  Ms. James, under the plea agreement that

7  you've entered into with the Government, you've waived just

8  about all of your rights to file an appeal, but you do have

9  some very limited rights remaining for ineffective assistance

10  of counsel and prosecutorial misconduct.  To the extent you

11  wish to file an appeal, you have 14 days to do so.

12          Mr. Schoettker, if you'll just remind her of

13  those limited appeal rights before you leave her this

14  afternoon.

15          Mr. Lamb, anything else we need to take up?

16          MR. LAMB:  Judge, the Government requests that the

17  motion for forfeiture judgment filed on January 13th, 2025,

18  that's Document 284 be granted, made final as to this

19  defendant, made part of the oral pronouncement of sentence, and

20  included in the written judgment.

21          THE COURT:  And I'll grant that request.

22          MR. LAMB:  Thank you, Your Honor.

23          THE COURT:  Mr. Schoettker, anything else from you?

24          MR. SCHOETTKER:  No, Your Honor.

25          THE COURT:  I will make this recommendation,

1    Ms. James, that you be placed at a facility as close to home as

2    possible.

3                    And when I say best of luck to you, I really mean

4    it.  This one really tears at me given the circumstances here,

5    because, gosh, you are a super smart girl and really -- and you

6    still do.  And now you're going to need to kind of crawl out of

7    this hole.  Okay?

8                    I am giving you supervised release for a term of

9    five years.  I am hoping that maybe halfway into it, that I

10   will get a request that you have done everything asked of you

11   and that you're on the road to success in life and that you

12   will make a request of me to terminate that supervised release,

13   but that requires you to do things that are required of you.

14   Okay?

15           THE DEFENDANT:  Yes, sir.

16           THE COURT:  All right.  Sentence is imposed as stated.

17   We're adjourned.

18                    (Proceedings concluded at 3:55 p.m.)

19

20

21

22

23

24

25

1                    COURT REPORTER'S CERTIFICATE

2            I certify that the foregoing is a correct transcript

3    from the record of proceedings in the above-entitled matter.

4            This 18th day of February, 2025.

5

6                              /s/Dee Coker
                               Registered Professional Reporter
7                              Official Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25